# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
March 27, 2012 Session

## STATE OF TENNESSEE v. ROBERT BLAKE BALL

**Direct Appeal from the Criminal Court for Greene County**
**No. 10-CR-043     John F. Dugger, Jr., Judge**

---

### No. E2011-01618-CCA-R3-CD - Filed September 26, 2012

---

The Defendant-Appellant, Robert Blake Ball, was convicted by a Greene County jury of attempted second degree murder and sentenced to eleven years' imprisonment. In this appeal, Ball challenges the sufficiency of the evidence supporting his conviction and the sentence imposed by the trial court. Upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and THOMAS T. WOODALL, J., joined.

Brent Hensley, (on appeal); Lindsey Wise-Lane, (at trial), Greenville, Tennessee for the Defendant-Appellant, Robert Blake Ball.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; C. Berkeley Bell, Jr., District Attorney General; Cecil Mills and Ritchie Collins, Assistant District Attorneys General, for the Appellee, State of Tennessee.

## OPINION

In this case, there is no dispute that Ball shot the victim, Michael Davis, while at a nightclub in Greene County, Tennessee. Ball immediately confessed to the shooting but said that it was an accident. Ball was later indicted for attempted first degree premeditated murder and the following proof was adduced at trial.

**Trial.** Jeff Johnson, a paramedic with the Greene County Emergency Medical Service, responded to the Houston Valley Club ("the club") in the early morning hours of December 13, 2009. Upon arrival, the victim was lying on the floor with what appeared to

be a gunshot wound to his abdominal area. Johnson said the victim had lost a significant amount of blood, had an exit wound to the right hip, and was transported by helicopter to a trauma center. On cross-examination, Johnson said the entry wound was in the abdominal area, directly below the naval. Johnson also agreed that he entered the club through an unlocked side door.

Michael Davis, the victim, testified that he was a life-long resident of Greene County. He and his girlfriend, Haley Cureton, had gone to the club on December 12, 2009, the night of the offense, to socialize with friends. The club was separated into two areas, a sports bar and the dance floor. The victim said that he had not had any problems with anyone that night. He agreed that he had been drinking through the night because it was free after 9 p.m. The victim did not have any weapons in his possession at the club. The victim knew Ball and Taylor Atenia and believed that they were romantically involved on the night of the offense. The victim said that he had a previous relationship with Atenia. He explained that a few months prior to the offense, Atenia stayed at his house for a few weeks. He was unsure if Atenia was involved with Ball during this time.

Prior to the shooting, the victim approached the bar to get a beer. As he was walking back to his table, the victim saw Ball and stopped to talk. The victim did not recall the specifics of the conversation but said they were "goofing off[.]" The victim said, "[N]ext thing I [knew Ball] said, 'I'm going to shoot you.' And I said, "Well, shoot me then." The victim then felt something hard, and said, "No you're not[.]" Immediately thereafter, Ball shot the victim. The victim said that Ball did not have any expression and did not appear to be joking before he shot the victim. The victim said he did not know why Ball shot him.

After he was shot, the victim fell to the floor. People at the club rendered aid by placing ice on his wounds. The victim was taken to Johnson City Medical Center and remained there for seven days. The victim explained the extent of his injuries to the jury and confirmed that the entry wound was under his naval. The victim was 6'3" tall and weighed 280 pounds at the time of the offense. He agreed that he was much taller than Ball.

On cross-examination, the victim said that he saw Ball after 1:00 a.m. He clarified his previous testimony and said that they approached each other. The victim had known Ball since the seventh grade and had never had a problem with him prior to the offense. The victim agreed that he had not seen Ball for a few months prior to the shooting. Prior to the offense, the victim went to the club every weekend but rarely saw Ball. The victim said there were three exits in the sports bar area. Two doors led directly to the outside, while the third door went through the dance area to get outside. The victim said that he never saw the gun come out of Ball's pocket when he was shot. Asked if there was any reason Ball would want to shoot him, the victim replied, "Not unless it had to do with Taylor Atenia or Holly

Ricker. I mean he had no reason." On re-direct examination, the victim confirmed that he had a sexual relationship with Taylor Atenia. He said that the night of the offense was the first time the had seen Ball since his sexual relationship with Atenia had ended.

Mark McClain, a deputy with the Greene County Sheriff's Department, was on regular patrol the night of the offense. Upon his arrival, he assisted security by handcuffing an unknown individual who had struck Ball while he was restrained. Deputy McClain also took possession of the gun that was recovered from the scene and identified it at trial. On cross-examination, Deputy McClain said that prior to placing the gun in the trunk of his car, he cleared it to ensure that no rounds were in the chamber. Deputy McClain also removed the clip from the gun. During his testimony, Deputy McClain examined the gun, which was similar to his service weapon, and said that it had "an external safety of a sort." He explained that the gun would not discharge unless the trigger was pulled. He later agreed that a person could pull the trigger on the gun, deactivate the safety, and fire the gun in one motion.

Brandon Lawler, the manager of the club, testified that he was on the sports bar side of the club before the shooting. He said the club was crowded that night with a relaxed atmosphere. He said it was a normal evening until he heard a "loud pop" and saw Doug Havens emerge from the crowd with Ball. Lawler began to assist Havens in securing Ball. Lawler did not hear Ball express concern for the victim. Lawler asked Ball what happened, and Ball replied, "it was an accident." Lawler realized that Ball had a loaded gun in his possession and retrieved the gun from inside the left pocket of Ball's jacket. Lawler took the gun to his bartender, Sarah Murphy, to secure it until the police arrived. Lawler then helped to place ice on the victim's wounds.

Haley Cureton, the victim's girlfriend, testified and corroborated the testimony of the victim. She additionally testified that they arrived at the club between 9:30 and 10 p.m. on December 12, 2009. Cureton observed Ball sitting at a table in front of them at 11:00 or 11:30 p.m. Sometime later that evening, Cureton heard a gunshot, looked down, and saw the victim on the floor. She simultaneously observed Ball "trying to run out that back door." However, Doug Havens, security for the club, grabbed Ball and slammed him on top of a pool table. Cureton described the situation as "chaotic" with people scattered throughout the club. Ultimately, Cureton went outside the club to catch her breath because someone had sprayed mace. On cross-examination, Cureton said that she was dating the victim at the time of the shooting. She did not know Ball and had never dated him. Cureton acknowledged that the victim and Ball spoke to each other but then went their separate ways. She confirmed that Ball sat at the bar of the club for an hour to an hour and a half, then left. Cureton said Ball returned to the club; however, she did not observe anything

unusual until she heard the gunshot. Prior to the shooting, Cureton did not observe Ball and the victim argue, push, shove or fight each other.

Nicholas Davis was three or four yards from the shooting when it occurred. After he heard a "pop," he saw the victim begin to fall. He further observed Ball headed toward a side door, but someone grabbed Ball and put him on a table. Davis heard Ball tell the person who grabbed him that he had a gun in his pocket. Davis said that, at this point, Ball's hands were in his pockets. Davis observed Ball struggle to break free, and then an unknown individual struck Ball while he was restrained on the table. Davis testified that Ball said, "I'm sorry" a number of times.

Sarah Murphy, the bartender at the club on the night of the offense, knew the victim as a regular patron of the bar and a friend. Murphy said the victim was "happy" that night. She recalled seeing someone, later determined to be Ball, with a black hood covering his face. She was going to explain the club's prohibition against hoods to him but was unable to do so. Murphy heard a "balloon popping" sound and then observed the victim's head with a little blood on it. She also saw security taking someone away. She said Brandon Lawler, the owner of the club, brought her a gun, which she identified at trial as the same gun she gave to the police the night of the offense. On cross-examination, Murphy acknowledged that the first time she saw Ball was when he spoke with the victim.

Chris Green, age twenty-four, testified that he had known Ball for eight or nine years. At trial, Green confirmed that he was serving a federal sentence and had a lengthy criminal history. Green testified that he and Amy Johnston, the mother of his two-year old son, met Ball at another nightclub, the Hyperion, on the night of the offense. Green, Johnston, and Ball shared a pitcher of beer at the Hyperion. Green testified that Ball discussed a "problem that [Ball] and Michael Davis had and he was just – he pretty much had a bad girlfriend, . . . and she caused him a lot of s**t[.]" Green said that Ball was referring to Taylor Atenia. Ball told Green that he was "tired of people messing with him and her and . . . thinking they could get away with it." Ball further said that the victim was "the main one because he was . . . going to the Valley and fighting him." Green recalled that Ball showed him a black, 9 millimeter pistol. Green testified that he was not promised anything from the State in exchange for his testimony.

Amy Johnston testified and corroborated the testimony of Chris Green. In addition, Johnston said that Ball was upset because his girlfriend had been cheating on him. Johnston said Ball asked them to go to the Houston Valley Club with him that night. Johnston declined to go because she did not want any "drama." At this point, Ball told Johnston "don't worry I've got this" and pointed to a dark handgun in his belt on the left side.

Johnston did not hear Ball threaten to harm the victim or Ball's intent to go to the Houston Valley Club to fight the victim.

Angie Weems, an evidence technician with the Greene County Sheriff's Department, was responsible for taking the evidence retrieved from the crime scene to the lab. She collected two nine millimeter rounds. She also collected the victim's jeans, belt, jacket, and shirt. Finally, she collected the defendant's jacket, shirt, pants, a gunshot residue kit, and a spent shell casing. The evidence collected from the scene did not contain a black hood.

Laura Hodge, a special agent with the Tennessee Bureau of Investigation (TBI), analyzed the gunshot residue kit, which contained the swabs collected from Ball's hands. She testified that elements of gunshot residue were not present. On cross-examination, Special Agent Hodge explained that if a gun was fired from inside a pocket, then she would expect gunshot residue to be confined in that area. In this case, however, she did not analyze any of Ball's clothes.

Don Carmen, a recently retired special agent with the TBI, testified as an expert in the area of forensic firearms identification. Special Agent Carmen examined the gun recovered from the crime scene, identified it as a Glock 9 millimeter, semi-automatic, and determined that it was in operable condition. The gun was also fully functional with safety features. Agent Carmen explained that

> The Glock itself has three safety features. You notice this particular pistol does not have any outside external manual safeties. They're all what we call passive safeties.
>
> . . .
>
> Passive safeties means that mentally . . . you do not have to be conscious to actually disengage the safety itself. It's basically combat ready. So the main safety is this little device here, right in the center, called the trigger safety. If this particular trigger was to actually - - something on the side, like I'm pushing on the very side of it, like we say you dropped it, whatever and something hit just on the side of it, it would not discharge. It would not release the firing pin. You actually have to have force applied directly in the middle here in order for the particular firing pin to go off like that.

Agent Carmen continued and said the Glock 9 millimeter had two other safety features, a drop pin and another passive safety, similar to the above described safety.

-5-

Based on his examination of the weapon, Agent Carmen opined that six pounds of force must be exerted on the trigger guard in order for the gun to discharge. He examined the 9 millimeter cartridge cases recovered from the crime scene and determined they were fired from the 9 millimeter Glock recovered from the crime scene. He also examined Ball's jacket and shirt recovered from the crime scene and determined there was no gunshot residue. On cross-examination, Agent Carmen agreed that gunshot residue should be present if a gun was fired and the muzzle was placed directly against an article of clothing. He further agreed that the spread of gunshot residue would be prevented if a gun were placed in a pocket and fired through the material.

James Russell Davis, a veteran forensic scientist of the TBI, testified that he performed gunshot residue analysis in this case. He examined Ball's jacket on the left side, including the left sleeve, left front, and left side of the front pocket. He found gunshot residue on the inside of the left side of Ball's jacket and on the left front side of Ball's pants. Gunshot residue was not found on Ball's shirt or belt. Special Agent Davis confirmed that a hole or tear was on the left front side of Ball's jacket.

Dr. Kristopher Kaufmann, the Chief of Trauma at Johnson City Medical, testified that the victim received two puncture wounds, consistent with gunshot wounds, one on the right side of the abdomen and the other on the buttock. The wound adjacent to the umbilicus button had some burn marks around it. Dr. Kaufmann provided the medical records and history detailing the victim's surgery, and he considered the victim's wounds life-threatening. On cross-examination, Dr. Kaufmann said that he was unable to provide a definitive angle of the gunshot or bullet because "bullets don't necessarily go in a straight line and you can't be sure which way a person is turned when they're shot."

Detective Vincent Tweed of the Greene County Sheriff's Department was on call the night of the offense and responded to the club. Prior to his arrival, he was advised that the suspect was in custody and that a gun had been recovered. He spoke with potential witnesses at the club, took crime scene photographs, and instructed officers to retrieve the victim's clothing from the hospital. He further instructed officers to transport Ball to the jail. Detective Tweed determined that Ball did not have a gun permit on file and read Ball his rights under Miranda. Ball acknowledged his rights, signed a form waiving his rights, and agreed to an interview with Detective Tweed. The statement taken during the interview was audio recorded and admitted at trial. The statement provided, in pertinent part, as follows:

DETECTIVE: Tell me from start to finish what happened[.]

BALL: Well, I drove up there and got out the car and realized I locked myself out of the car, so I couldn't leave the gun in the car. I took the gun from my mom without her knowing, because I had some threats made to me by some people over a girl I was seeing.

DETECTIVE: That gun right there?

BALL: Yes sir.

DETECTIVE: OK.

BALL: Glock 9 with a comperated (sic) barrel[.]

DETECTIVE: Yep, That's the one they took from you. Just initial that right there. That's a picture of it.

DETECTIVE: Ok, then what happened?

BALL: So, I realized that I locked myself out. So, I told the guy at the Valley that I was going to go in and get me a ride out of there. And I went in and was trying to find a ride[.]

. . . .

BALL: Michael walked over there to me. I nudged him and he nudged me just playing around cause I've know[n] him since I was in grade school.

DETECTIVE: Michael who?

BALL: Davis, Yea, We've been friends since grade school and Ah, I was just playing around.

. . . .

BALL: He's a good guy. He got two kids and stuff. I reached.

DETECTIVE: Ok, you went over to him and what happened?

BALL: No, [h]e, [h]e walked over to me. We were there and I stuck my hand in there just playing. I was like . . . "Be careful be careful or something like

that" and I accidentally and I was just playing. I wasn't, I didn't mean and the gun went off. Then I looked and he was falling. So, I grabbed him I said Michael are you OK? Are you OK? Are you OK man? Then I got up turned around to get some help by that time the bouncer done grabbed me by the throat and they slammed me over there. I said man just let me go I just want to see if he is OK. But.

. . . .

BALL: I was just playing around and the damn thing went off. It freaked me out cause I didn't. It was like bam I was like. I stalled for just a second. Then I seen Michael start falling. I went to help him. I shot him.

DETECTIVE: OK, but you didn't mean to shoot him?

BALL: No sir, [i]f I . . .

DETECTIVE: Did you have your finger on the trigger?

BALL: No, I tried to put it. I thought I was putting it on the trigger guard just playing around. But I was being a dumb a[–] excuse my language but there's no other way to say it. I shot my buddy.

Detective Tweed continued the investigation and interviewed other witnesses, including the victim, and determined that he needed to talk to Ball again. In his second statement, which was also recorded and played for the jury, Ball agreed that he told the victim, "I'm going to shoot you," before he shot the victim. Ball explained that he was joking with the victim and did not intend to shoot him. Ball said officers would find a bullet hole in his jacket and denied pulling the gun out of his pocket to shoot the victim. Detective Tweed said that Ball was fully cooperative with the investigation.

Detective Tweed described the condition of the gun when it was recovered and said that it contained two live rounds. Detective Tweed further noted that an expended round shell casing was jammed within the gun. Detective Tweed agreed that when a projectile is not properly ejected something on the gun has either malfunctioned or prohibited a round from ejecting properly. Detective Tweed said that there were three holes found on Ball's jacket; however, only one hole went through the interior to the exterior of the jacket. Detective Tweed agreed that the gun discharged inside of Ball's pocket and that a person could pull the trigger with the safety on this particular gun. Finally, Detective Tweed confirmed that no black hood was recovered from the crime scene.

Doug Havens was working security at the club on the night of the offense. After hearing a loud "pop," Havens proceeded toward a wooden door separating the sports bar from the main bar area. As Havens went through the doorway, Ball was exiting and "hunkered down like he was trying to get away from something." Havens then grabbed Ball by his right arm and "took him to the pool table." Upon realizing that Ball had a gun, Havens choked Ball until Ball was unconscious. Havens said Ball was unconscious for ten or fifteen seconds and was restrained until the police arrived. Havens said when Ball awoke, Ball struggled with him. Haven further agreed that he testified at a previous hearing that he grabbed Ball because Ball was wearing a hood. Havens agreed that once Ball was detained on the pool table, Ball was upset and said that he was sorry.

Clayton Babb had known Ball for five or six years. They had gone to school together, and Babb had worked for Ball. Babb knew the victim but had "just seen him around." Babb had gone to the club on the night of the offense to celebrate a friend's going to the Army. Around 11 p.m. or midnight, Ball asked Babb if he could give him a ride home because Ball had locked his keys in his car. Babb said he had to get his mother's permission because he was driving her car. Babb said that Ball appeared normal and did not seem upset. Babb said he observed the victim and Ball talking. He was unable to hear exactly what was said because the music was loud, and he was busy texting his girlfriend. When Babb heard the gunshot, he jumped up and saw the victim fall to the ground. Babb said Ball "grabbed [the victim's] shoulders and helped [the victim] to the ground." Ball appeared "panicked" and was then restrained by security. On cross-examination, Babb denied telling Ball to "quit playing around" on the night of the offense. Babb further conceded that he was drunk on the night of the offense and that his perception may have been affected.

Christopher Grizzle had known Ball for five or six years. Grizzle recalled that on the night of the offense he was at the Hyperion nightclub. He said he remembered that night because the Hyperion was showing an ultimate fighting championship pay per view event. Grizzle met Ball at the Hyperion that night around 9:00 p.m. He and Ball sat and ate in the same booth for about forty-five minutes. They were talking about a friend who had gotten into trouble. Grizzle said that this was the first time he encountered Chris Green. He said Green came over and sat down in a booth close to theirs. He said Green spoke with Ball but that Ball never left their booth. He said Ball did not appear upset and did not show Green a gun. On cross-examination, Grizzle confirmed that the ultimate fighting championship started at 10:00 p.m., eastern standard time. He agreed that he left the Hyperion at 10:30 or 10:45 p.m. He insisted that he arrived at 9:00 p.m. but was only able to watch the preliminary fights because he had gotten into an argument with his ex-girlfriend and went home. Grizzle confirmed that he was previously convicted of theft of property under $500 and robbery.

Ball testified on his own behalf. He explained that on the night of the offense he had gone to the Hyperion club twice. His first visit to the Hyperion was "early," with a female friend, and lasted thirty minutes to an hour. Ball said he returned to the Hyperion alone that night to watch the pay per view event. He sat down, spoke with Grizzle, and had one shot of alcohol. Ball said he also spoke with Green, who sat at a booth near them. Ball said that he had not seen Green in over a year. Ball denied having a gun inside the Hyperion and claimed that the gun was in his car. Ball acknowledged that Amy Johnston was with Green, and said that they were drinking. When Ball left the Hyperion, he intended to go home. He removed the gun from underneath his seat and placed it in his pocket. However, instead of going home, Ball said, "[f]or some reason[,] I just decided to go up to the . . . Houston Valley Club." Asked why he was carrying the gun, Ball said

> I was being threatened. I was with a girl. [T]hat I guess she ripped some people off while I was out of town or, yeah, I was out of town; they had called and was threatening her and I started answering the phone one time and they started threatening me and they told me they were going to kill me and they told me where she lived and then they told me who I was and where I lived.

Ball said he did not know the person who was threatening him. He was certain, however, that it was not the victim. When he arrived at the Houston Valley Club, he parked and exited his car. Before entering the club, Ball realized that he had the gun and returned to his car. At this point, he realized that he had locked his keys in his car. He said he knew that taking the gun into the club was wrong and went inside the club in search of a ride home. He saw Babb, who could not give him a ride without his mother's permission. Ball continued to look for another ride and saw the victim. He said the victim approached him, and they were "kind of joking around a little bit[.]" Ball decided to show the victim the gun to express how urgently Ball needed "to get out of the bar[.]" Ball showed the victim the butt of the gun and attempted to twist the gun. Ball said he tried to "pull just a little bit to show him the butt again, and [the gun] fired." He said he knew the gun was loaded but he did not know that a bullet was in the chamber. Ball said that he did not argue with the victim that night, had no reason to be upset with the victim, and had never had any problems with the victim.

During his testimony, Ball put on the jacket he wore the night of the shooting, demonstrated where the gun was positioned, and said the gun discharged through his jacket. He did not intend to shoot the victim. As the victim began to fall, Ball asked if the victim was okay and told him that he was sorry.

Ball confirmed that security for the club grabbed him, threw him on the pool table, and choked him until he was unconscious. He said he struggled with security only to avoid

-10-

getting hit. Ball said he was sprayed with mace and "beat[en]-up." Ball also testified that he began dating Taylor Atenia at the end of August or beginning of September. He was unaware of any sexual relationship between Taylor Atenia and the victim. Ball said Taylor Atenia was not at the Houston Valley Club on the night of the offense.

On cross-examination, Ball said that he was threatened "about a week" prior to the offense. He said he handled the gun three times prior to the offense. He agreed that Holly Ricker, the victim's ex-wife, "stayed at his house," but that the victim was not involved with Ricker at that time. On re-direct examination, Ball explained that he and the victim had discussed Holly Ricker in August 2009. Ball told the victim that he knew what Ricker had done to the victim and "just didn't want no part of her." The jury was permitted to examine the safety and trigger mechanism of the gun.

The jury convicted Ball of attempted second degree murder and fixed a $25,000 fine. Following a sentencing hearing, the trial court ordered Ball to serve eleven years' imprisonment and imposed a $25,000 fine. The instant appeal followed.

## ANALYSIS

**I. Sufficiency of the Evidence**. In challenging the evidence supporting his conviction, Ball specifically contends that the State failed to prove that he "knowingly" shot the victim. Although he concedes that he shot the victim, he claims, as he did at trial, that it was an accident and that he did not possess the requisite *mens rea* to support a conviction of attempted second degree murder. In response, the State contends that the jury rejected Ball's defense theory, and therefore, the proof was sufficient to support his conviction. We agree with the State.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, the standard of review applied by this court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d

-11-

895, 897 (Tenn. 1961)).  The trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and must reconcile all conflicts in the evidence.  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).  When reviewing issues regarding the sufficiency of the evidence, this court shall not "reweigh or reevaluate the evidence."  Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). This court has often stated that "[a] guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory."  Bland, 958 S.W.2d at 659.  A guilty verdict also "removes the presumption of innocence and replaces it with a presumption of guilt, and the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Id. (citing State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence."  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)).  However, "[t]he jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'"  State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable, 313 S.W.2d at 457).  This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence.  State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010) (citing Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956)).  We note that the standard of review "'is the same whether the conviction is based upon direct or circumstantial evidence.'"  State v. Hanson, 279 S.W.3d 265, 275 (quoting State v. Sutton, 166 S.W.3d 686, 689 (Tenn. 2005)); State v. Carruthers, 35 S.W.3d 516, 557 (Tenn. 2000).

Second degree murder, a Class A Felony, is the "knowing killing of another."  T.C.A. § 39-13-210(a)(1) (2006).  "A person acts knowingly ... when the person is aware that the conduct is reasonably certain to cause the result."  Id. § 39-11-302(b).  Criminal attempt requires, as relevant here, proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense . . . and the conduct constitutes a substantial step toward the commission of the offense."  Id. § 39-12-101(a)(3).  Attempted second degree murder, therefore, requires the State to prove that a defendant acted with the intent to knowingly kill another and took a substantial step toward doing so.  A defendant's mental state is a factual question for the jury to resolve.  State v. Brown, 311 S .W.3d 422, 432 (Tenn. 2010) (citing State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000)).  The Tennessee Supreme Court has explained that circumstantial evidence is often the only means of proving mental state: "[W]hile a defendant's mental state is rarely subject to proof by direct evidence, it is within the authority of the jury to infer the defendant's intent, and,

therefore, whether the defendant acted 'knowingly,' from surrounding facts and circumstances." Brown, 311 S.W.3d at 432 (citations and quotations omitted).

Taken in the light most favorable to the State, the evidence in this case is sufficient to support a conviction of attempted second degree murder. Ball told authorities that the shooting was an accident and that he was only joking. While the gun was in his pocket, Ball intended to check the safety, but the gun discharged. Ball's theory was that he somehow confused the gun's safety mechanism with the trigger, or the gun malfunctioned. He fully developed his defense at trial.

However, the jury also heard the testimony of the victim, who said that Ball told him he was going to shoot him before Ball, in fact, shot the victim. The victim said that Ball did not appear to be joking when he shot him. In addition, the proof established that Ball had been at the Hyperion with Green and Johnston prior to going to the club. While there, Ball told Green that he had a problem with the victim and showed Johnston his gun to illustrate how he would handle any "drama" at the club. Ball told Green that he was tired of the victim "messing" with him and Taylor Atenia and "thinking he could get away with it." The victim confirmed that he had been involved in a sexual relationship with Ball's girlfriend, Taylor Atenia. Finally, a firearms expert testified that a person must exert six pounds of pressure on the trigger of the gun in order for it to discharge.

Upon this proof, we conclude that a reasonable juror could find that the shooting was knowing, not accidental. Accordingly, the proof is sufficient to support a conviction of attempt to commit second degree murder. Ball is not entitled to relief.

**II. Sentence.** Ball challenges the trial court's imposition of an eleven-year sentence as improper. In response, the State contends that the trial court properly imposed sentence after considering the applicable enhancement and mitigating factors. We agree with the State.

On appeal, we must review issues regarding the length and manner of service of a sentence de novo with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2006). Nevertheless, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). Our review is de novo, without a presumption of correctness, if the trial court applied inappropriate mitigating or enhancement factors or otherwise failed to follow the principles of the Sentencing Act. State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008). The defendant, not the State, has the

-13-

burden of showing the impropriety of the sentence. T.C.A. § 40-35-401(d) (2006), Sentencing Commission Comments.

The record shows that the trial court considered the applicable sentencing principles, as well as the relevant facts and circumstances; therefore, our review of sentencing is de novo with a presumption that the trial court's determinations are correct. See T.C.A. § 40-35-401(d) (2005); State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (1) the evidence adduced at the trial and the sentencing hearing; (2) the pre-sentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (6) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses; and (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210(b); see also State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002); State v. Osborne, 251 S.W.3d 1, 24 (Tenn. Crim. App. 2007).

The Tennessee Supreme Court has stated that the 2005 Amendments to the Sentencing Act "deleted as grounds for appeal a claim that the trial court did not weigh properly the enhancement and mitigating factors." Carter, 254 S.W.3d at 344. In sentencing a defendant, the trial court must consider the sentencing guideline that suggests an adjustment to the defendant's sentence when enhancement or mitigating factors are present; however, these factors under the guideline are merely advisory rather than binding upon a trial court's sentencing decision. Id.; see also T.C.A. § 40-35-210 (2006). The weight given to each enhancement or mitigating factor is left to the sound discretion of the trial court. Id. Thus, this court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Ball was convicted as a Range I, standard offender of attempt to commit second degree murder. Under these circumstances, attempted second degree murder, a Class B felony, has a sentencing range of eight to twelve years. T.C.A. §§ 39-12-101, -107(a), 40-35-112(a)(2). The trial court applied enhancement factor (6), the personal injuries inflicted upon the victim were particularly great, and (9), the defendant possessed or employed a firearm during the commission of this offense. Id. § 40-35-114(6), (9) (2006). Ball does not contest the application of these enhancement factors. Section 40-35-113 contains a non-exclusive list of mitigating factors that a trial court may apply to a

defendant's sentence "[i]f appropriate for the offense." T.C.A. § 40-35-113 (2006). Ball argues that the trial court should have applied the following mitigating factors from that list:

(3) Substantial grounds exist tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense;

. . . .

(10) The defendant assisted authorities in locating or recovering any property or person involved in the crime;

. . . .

(11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]

Id. § 40-35-113 (3), (10), (11) (2006). A defendant has the burden of proving applicable mitigating factors. State v. Mark Moore, No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App., at Knoxville, Sept. 18, 1995) (citing T.C.A. § 40-35-401(d)).

The trial court found that each of the above mitigating factors proposed by Ball were inapplicable to his sentence. In rejecting mitigating factor (3), the trial court stated "[t]here were no substantial grounds to excuse or justify [Ball] taking a loaded Glock into a crowded bar, [and] showing that Glock before you went there at another bar[.]" The court also reasoned, based on Cureton's testimony, that Ball had been staring at the victim "for a long period of time" prior to shooting him. In rejecting mitigating factor (10), the trial court stated, "the testimony from Mr. Lawler was that you were pinned down on the pool table after the shooting and that [Mr. Lawler] removed the gun[.]" The court reasoned that the weapon was recovered without any assistance from Ball. In rejecting mitigating factor (11), the court stated that Ball had "a sustained intent" because Ball brandished the gun at two different bars, stared at the victim prior to the shooting, and had "a problem" with the victim based on his relationship with a woman with whom Ball was romantically involved.

Upon our review, we hold that the trial court did not err in sentencing Ball to eleven years for attempt to commit second degree murder. In regard to mitigating factors (3) and (11), Ball relies entirely upon his claim that the shooting was accidental. T.C.A. 40-35-113 (3), (11). There was more than sufficient proof at trial showing that the shooting was not an accident, therefore, the trial court properly denied application of mitigating factors (3) and (11). In regard to mitigating factor (10), Ball's claim that he assisted the authorities

with locating the gun, we agree with the trial court and conclude that the gun was taken from Ball after he was restrained. The record simply does not support Ball's claim that he provided assistance to authorities in locating the gun. Accordingly, we believe that Ball's sentence is consistent with the principles of the Sentencing Act. The trial court acted within its discretion in sentencing Ball three years above the statutory minimum. Ball is not entitled to relief on this issue.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE